# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 14-** |
| **v.** | : | **DATE FILED:** |
| **SUPREME FOODSERVICE GMBH, f/k/a** | : | **VIOLATIONS:** |
| **SUPREME FOODSERVICE AG** | | **18 U.S. C. § 1031 (major fraud against the United States – 1 count)** |
| **SUPREME FOODSERVICE FZE** | : | **18 U.S.C. § 371 (conspiracy to commit major fraud against the United States – 1 count)** |
| | : | **18 U.S.C. § 1343 (wire fraud - 1 count)** |
| | | **Notice of forfeiture** |

# INFORMATION

## COUNT ONE

(Major Fraud Against the United States)

**THE UNITED STATES ATTORNEY CHARGES THAT:**

At all times material to this information:

1.       Defendant Supreme Foodservice GmbH, formerly known as Supreme Foodservice AG ("Supreme AG"), was a Swiss company that provided support services to military and non-military customers around the world.  From at least 2004 until in or about 2009, defendant Supreme AG was owned by two individuals known to the United States Attorney:  Supreme Owner#1, who held 75% of the shares of Supreme AG, and Supreme Owner#2, who held 25%.

2.       In that same time period, Supreme Owner#1's spouse and Supreme Owner#2's spouse owned a German company, referred to here as "Supreme Company K," that "provided

1

management services" to defendant Supreme AG.  Together with, and through, their spouses, Supreme Owner#1 and Supreme Owner#2 controlled Supreme Company K.

3.      Defendant Supreme Foodservice FZE (together with its subsidiaries, "Supreme FZE") was formed in the United Arab Emirates (UAE) in or about 2008, at which time ownership of Supreme Company K was transferred from the spouses of Supreme Owner#1 and Supreme Owner#2 to defendant Supreme FZE.

4.      As of approximately 2009, defendants Supreme AG and Supreme FZE came to have common ownership, in the form of several holding companies including a company incorporated in the Netherlands which came to own 100% of Supreme AG and, through several intermediary companies, including Supreme FZE, 100% of Supreme Company K.

5.      In or about June of 2009, defendant Supreme AG was renamed "Supreme Foodservice GmbH."  The group of companies affiliated with Supreme AG will be referred to here as the "Supreme group of companies" or "Supreme."

6.      Supreme Owner#1 was the majority owner of defendant Supreme AG, served as Managing Director of the Supreme group of companies, oversaw all of the operations of Supreme, and had final say on all decisions of companies within the Supreme group of companies, including but not limited to defendant Supreme AG, defendant Supreme FZE, and Supreme Company K.

7.      Supreme Owner#2 was the minority owner of defendant Supreme AG, served as Director, and oversaw the business operations of the Supreme group of companies.

8.      Defendant Supreme AG employed over 1,800 employees in 2006 and over 3,000 employees in April of 2009.  The Supreme group of companies employed more than 5,000 employees by sometime in 2009.

9.      As used here, "Supreme Executive" or "Supreme Manager" refers to an individual who worked as an executive or manager within the Supreme group of companies. Such persons worked for Supreme AG, Supreme FZE, Supreme Company K, or another company within the Supreme group of companies.  Supreme Executives 1 through 10, known to the United States Attorney, are referred to here as SE#1 through SE#10.  All Supreme Executives and Supreme Managers reported directly or indirectly to Supreme Owner#1 and Supreme Owner#2.

10.     The Defense Logistics Agency Troop Support ("DLA Troop Support"), formerly known as the Defense Supply Center Philadelphia ("DSCP"), located in Philadelphia, Pennsylvania, in the Eastern District of Pennsylvania, was a component of the Defense Logistics Agency ("DLA") Department of Defense ("DoD"), an agency of the United States.  Among other things, the DSCP administered contracts to supply armed forces personnel with essential supplies, including food and water.

11.     The U.S. Army Military Surface Deployment and Distribution Command ("SDDC") was a part of the U.S. Transportation Command ("TRANSCOM").  SDDC had contracts with transportation companies to deliver goods, and was responsible for some of the transportation of equipment and supplies under U.S. government contracts, including the DSCP's Subsistence Prime Vendor contracts.

12.     On or about June 3, 2005, the DSCP awarded the Subsistence Prime Vendor ("SPV") Contract for Afghanistan, contract number SPM300-05-D-3130, to defendant Supreme

3

AG. As the Prime Vendor on the SPV Contract, defendant Supreme AG would acquire and sell to the United States food and water for the armed forces serving in Afghanistan. Under the SPV Contract, defendant Supreme AG would acquire food and water as requisitioned by the armed forces through the government's electronic ordering system, Subsistence Total Order and Receipt Electronic System ("STORES"), a part of which is sometimes referred to as the "catalog," and deliver that food and water to the armed forces.

13.     Under the terms of the SPV Contract between the DSCP and defendant Supreme AG, Supreme AG was permitted to charge the DSCP a "Unit Price" for goods, which consisted of the "Delivered Price" of the goods and a "Fixed Distribution Price (or Fee)" which had been set by defendant Supreme AG, as the Prime Vendor, for that type of item.

14.     For goods that originated outside of the contiguous United States (OCONUS), the SPV Contract defined "Delivered Price" as: "the manufacturer/supplier's actual invoice price (in U.S. currency) to deliver product to the Prime Vendor's OCONUS distribution point." The OCONUS distribution point for defendant Supreme AG under the SPV Contract was Supreme's warehouse in Kabul, Afghanistan.

15.     The SPV Contract defined the "Distribution Price," or "Distribution Fee," as: "a firm fixed price, offered as a dollar amount, which represents all elements . . . other than the delivered price." The definitional provision of "Distribution Fee" in the SPV Contract further stated: "The distribution price typically consists of the Prime Vendor's projected general and administrative expenses, overhead, profit, packaging costs, transportation cost from the Prime Vendor's OCONUS distribution facility(s) to the final delivery point or any other projected expenses associated with the distribution function. This distribution price is intended to reflect

4

the difference between the delivered price and the unit price to deliver the specified product to the ordering activity. This distribution price shall represent the amount to be added to the actual invoice price paid to the manufacturer or supplier by the Prime Vendor for each item. This distribution price shall remain fixed for the base year of the contract, and is subject to any agreed option year adjustments."

16.     Beginning in or about July 2005, Supreme Owner#1 and Supreme Owner#2 directed the creation of a company in the UAE referred to here as "J Company." J Company was eventually owned by Supreme and J.I.M.A., a UAE national known to the United States Attorney. At all times, final decisions for all aspects of J Company's management were made by Supreme Owner#1 and Supreme Owner#2.

17.     The value of the SPV Contract between the DSCP and defendant Supreme AG exceeded $1,000,000. Between December 2005 and December 2013, the DSCP paid defendant Supreme AG approximately $8.8 billion for its services under the SPV Contract.

18.     When the solicitation for the SPV Contract was issued, it called for the Prime Vendor to deliver goods to only four sites within Afghanistan, each of which was a fairly large site with some infrastructure. Shortly after defendant Supreme AG was awarded the SPV Contract, the contract was modified to require delivery to a number of additional sites (Forward Operating Bases, or FOBs) where troops were located, many or most of which did not have infrastructure and involved fairly small numbers of troops.

19.     In light of the changes to the delivery locations, the DSCP agreed to additional, separate, payment streams to compensate defendant Supreme AG for the extra work and costs associated with the new sites. Specifically, in addition to paying the Unit Price for goods, the

5

DSCP paid defendant Supreme AG:  1) a set sum for the preparation and packing of each insulated cardboard box (called a "triwall") which contained some of the OCONUS perishable goods ordered by the troops ("triwall payments"); and 2) specific rates for different types of transportation -- such as fixed wing and rotary wing flights -- necessary to get goods out to the FOBs ("premium outbound transportation" or "POT").   The DSCP also paid a set sum per pound of goods to ship some goods, by air, into Afghanistan ("inbound air").

20.     Among the goods which the SPV Contract required the Prime Vendor to acquire and deliver were Local Market Ready goods ("LMR"), which consisted primarily of perishable or short shelf-life goods that were purchased from suppliers outside of the United States.

## THE SCHEME TO DEFRAUD

21.     From at least in or about July 2005, through and including in or about April 2009, in the Eastern District of Pennsylvania and elsewhere, defendants

### SUPREME FOODSERVICE AG and
### SUPREME FOODSERVICE FZE

knowingly devised and intended to devise a scheme to defraud the United States and to obtain money and property of the United States, by materially false and fraudulent pretenses, representations, and promises, in connection with the SPV Contract.

22.     It was the object of this scheme that defendants Supreme AG and Supreme FZE make profits over and above the profits made from the Distribution Fees in the SPV Contract by fraudulently inflating the Delivered Price for Local Market Ready goods (or LMR) sold to the United States under the SPV Contract, and by fraudulently setting an inflated Delivered Price for bottled water sold to the United States under the SPV Contract.

## MANNER AND MEANS

It was a part of the scheme that:

23.     Defendants Supreme AG and Supreme FZE, Supreme Owner#1, and Supreme Owner#2 created a company in the United Arab Emirates referred to here as "J Company," and used that company as a middleman in order to realize a secret profit on LMR.

24.     Defendants Supreme AG and Supreme FZE, Supreme Owner#1, and Supreme Owner#2 created an artificially high Delivered Price for bottled water, used J Company as a middleman to invoice the bottled water to defendant Supreme AG, and had Supreme Company K charge an artificially high price to transport water into Supreme's warehouse in Kabul, Afghanistan.

## USING J COMPANY TO INFLATE THE DELIVERED PRICE OF LMR

25.     Defendants Supreme AG and Supreme FZE, and Supreme Owners#1 and #2 used J Company to fraudulently inflate the Delivered Price of LMR.  In connection with this scheme, defendants Supreme AG and Supreme FZE, and Supreme Owners#1 and #2 made concerted efforts to conceal Supreme's true relationship with J Company, and to make J Company's mark-up on LMR look legitimate.  Defendants Supreme AG and Supreme FZE, and Supreme Owners#1 and #2 tried to prevent the DSCP from learning of the true relationship between Supreme and J Company.  Further, defendants Supreme AG and Supreme FZE, and Supreme Owners#1 and #2 tried to prevent the DSCP from learning of the J Company mark-ups, including by omitting the mark-up when Supreme personnel believed that the DSCP knew the true supplier price of the LMR.  Defendants Supreme AG and Supreme FZE, and Supreme Owners#1 and #2

persisted in the fraudulent mark-ups even in the face of questions from the DSCP's personnel about the pricing of LMR.

**Forming J Company and Setting J Company Prices**

26.     From the time of the formation of J Company, defendant Supreme AG and its owners intentionally did not disclose to the DSCP that defendant Supreme AG and its owners had formed J Company, and that defendant Supreme AG and its owners controlled J Company. Instead, defendant Supreme AG and its owners created the false appearance that J Company was a third party entity that was independent of Supreme.

27.     Supreme personnel created letterhead and other indicia to suggest that J Company was an entity separate and apart from Supreme.  However, personnel hired by J Company were hired by Supreme personnel, and persons who nominally worked for J Company were compensated from a bank account which Supreme personnel had set up in J Company's name. Defendant Supreme AG and its owners controlled this bank account, and periodically drained the assets from this account, including by having Supreme Company K send an invoice to J Company each month for an amount which equaled any surplus in J Company's account.

28.     Defendant Supreme AG and its owners used J Company to purchase LMR. Defendant Supreme AG and its owners then caused J Company to sell that LMR to defendant Supreme AG, so that Supreme AG could resell that LMR to the armed forces pursuant to the SPV Contract.  In setting the prices at which J Company would sell the LMR to defendant Supreme AG, Supreme AG and its owners built in a mark-up for J Company which varied from commodity to commodity.  Defendant Supreme AG and its owners then had Supreme AG bill the DSCP for the LMR at the price that defendant Supreme AG had "purchased" the LMR from J

8

Company, falsely representing this as the Delivered Price of the LMR.  Defendant Supreme AG and its owners knowingly concealed from the DSCP that the supposed Delivered Price included a mark-up on the LMR, and further concealed that the profit built into J Company's mark-up was paid over to Supreme AG and Supreme Company K.

29.     In setting the prices that J Company would charge defendant Supreme AG, Supreme AG and its owners did not base the price on the real costs of any activities nominally undertaken by J Company.  Instead, defendant Supreme AG and its owners set J Company's prices at a level that was designed to maximize the illicit profit without provoking scrutiny by the DSCP.

30.     On or about August 22, 2005, SE#4, who at relevant times held the title "Director of Purchasing," sent an email to Supreme Owner#1, among others, saying that the prices which he proposed that Supreme AG charge the DSCP for certain items already included margins of "approximately 57-60%" over the price from the supplier.  SE#1, who at relevant times held the title "Director - Commercial Division and Supply Chain," sent a reply email, including to Supreme Owner#1, recommending that Supreme AG not raise the prices further because "we would like to stay credible with the customer," and would not want to invite a "challenge" from the DSCP.

31.     Defendant Supreme AG's owners were directly involved in setting the fraudulently inflated Delivered Prices for LMR.  In September of 2005, Supreme Owner#1 specifically instructed other top management within Supreme that he would personally "review the LMR mark-up before [J Company] makes its first shipment."  Thereafter, Supreme Owner#1 reviewed and made changes to the markups for some specific items.  Among other things,

Supreme Owner#1 increased the markup that J Company would impose on non-alcoholic beer from 25% to 125%.

**Fresh Fruits and Vegetables (FF&V)**

32.     The LMR that defendant Supreme AG and its owners had J Company acquire and resell to Supreme AG included fresh fruits and vegetables (FF&V), which were purchased from a supplier in the UAE.  To fill specific orders for provisions placed by the troops through the STORES catalog, FF&V and certain other highly-perishable LMR were picked and packed -- by personnel paid by funds from the J Company bank account -- into insulated cardboard boxes called "triwalls" for shipment into Afghanistan.

33.     In addition to paying defendant Supreme AG the Unit Price for the goods that were packed into the triwalls, the DSCP paid Supreme AG a substantial sum per triwall.  These triwall payments exceeded all of the costs and expenses associated with the acquisition, picking, and packing of the goods being placed in the triwalls, as well as the construction and ground transportation of the triwalls themselves.  The triwall payments also provided defendant Supreme AG with a very substantial profit on each triwall, over and above the profit that was built into the fixed Distribution Fees for the product itself.  Despite receiving the triwall payments, defendant Supreme AG and its owners continued to add a J Company mark-up to the costs of the LMR which was packed into triwalls.

**Sea-Freight LMR**

34.     The LMR which defendant Supreme AG and its owners had J Company acquire and resell to Supreme AG included some LMR that was not packed into triwalls, but was instead acquired in bulk from the manufacturer/supplier, and was then sent in containers by sea freight

into Afghanistan directly from the manufacturer/supplier ("Sea-Freight LMR").  Such Sea-Freight LMR included ice cream, juices, soda, long-life milk, non-alcoholic beer, and snacks.

35.     Even though no one from J Company actually handled or touched the Sea-Freight LMR, defendant Supreme AG and its owners had the suppliers of the Sea-Freight LMR sell their commodities to J Company, and had J Company mark up those products and resell them to defendant Supreme AG, before Supreme AG sold those commodities to the DSCP.

36.     Defendant Supreme AG and its owners included a J Company mark-up in the Delivered Price of Sea-Freight LMR even though the costs of transporting that LMR was borne by the United States government.

37.     In this way, defendant Supreme AG and its owners improperly caused the DSCP to pay Supreme AG significantly more than the true price to acquire and deliver LMR to Supreme's OCONUS distribution point.

## Concealing Supreme's Ownership and Control of J Company and Trying to Make J Company's Mark-Up Look Legitimate

38.     To prevent disclosure to the United States and the DSCP that Supreme owned and controlled J Company, defendant Supreme AG and its owners tried to keep information about Supreme's true relationship with J Company from being too widely known, even within J Company or the Supreme group of companies.

39.     On or about November 2, 2005, Supreme Owner#1 emailed SE#1 and SE#6, who at relevant times held the title "Group Financing and IT Director," seeking their "assurances that the [J Company] setup has been completed," and asking whether Supreme Company K would bill transport costs to J Company or to Supreme AG.  SE#1 replied that based on his discussions

with SE#6, "it should be charged to [J Company] simply because AG would get invoice from a 'neutral' company not related with AG." (Internal quotes in original).

40.     On or about December 19, 2005, when a Supreme employee created a Supreme organizational chart that included J Company, SE#1 wrote, "No [J Company] person can be shown in a Supreme chart for various reason [sic].  [J Company] is a supplier to Supreme."

41.     On or about January 27-28, 2006, when Supreme Executives were discussing whether J Company should organize the airfreight for all Supreme activities in Afghanistan, Supreme Owner#1 told SE#1 that "the problem" with discussions about J Company having that role was that many Supreme employees were now asking what J Company was, and what Supreme's relationship to J Company was.  As such, per Supreme Owner#1, SE#1 should "please refrain."

42.     On or about January 31, 2006, in discussing how J Company should acquire a warehouse that would supposedly store water and sodas, SE#1 emailed other Supreme Managers, and J Company's General Manager, that "we would like to show activities of [J Company] to DSCP justifying pricing."  SE#2, who at relevant times held the title "Director - U.S. DoD Division," then critiqued that email, telling SE#1 that "You should not mention 'price justification' to [the General Manager of J Company].  This is not clever as he is a 'loose cannon.'  He sometimes is too free with his information sharing." (Internal quotes in original).

43.     On or about February 16, 2006, during a discussion about defendant Supreme AG supplying a new product to the U.S. government, SE#4 wrote to SE#2:  "I am very sure the best option is to buy it from Germany and Mark up via [J Company], like [non-alcoholic] beer."

44.     On or about March 6, 2006, in discussing the decision by Supreme's top management to have defendant Supreme AG stop buying water directly, and instead to have all water purchased by J Company for resale to Supreme AG, SE#2 wrote to SE#1 (with a copy to Supreme Owner#1): "Be careful with [J Company] - it will be hard to justify - I will let you answer all [DSCP contracting officer] queries on [J Company] - I will not participate."

45.     On or about March 18, 2006, in discussing whether they could inflate the price for ice cubes to be sold to the DSCP, SE#1 wrote to Supreme Owner#1, SE#4, and SE#2: "I don't think we can mark up through [J Company] since DSCP knows price from [the supplier]." That same day, Supreme Owner#1 forwarded that March 18, 2006 email to Supreme Owner#2 with a comment in German which translates: "There are dozens of emails like that one."

46.     On or about May 29, 2006, during a discussion about the costs of selling FF&V to a large commercial franchise in Afghanistan, and the fact that the prices to be charged were significantly lower than the prices charged to the DSCP, SE#1 wrote to SE#2 and another Supreme Executive (with a copy to the General Manager of J Company): "do you really think contracting with the Pakistani franchisee has a [sic] intrinsic risk of disclosure to DSCP?  If you really see that risk we have to stop, no doubt about it."

47.     In early 2006, defendant Supreme AG and Supreme Owner#1 decided to have other components of Supreme buy from J Company to try to justify the J Company prices that were being charged to the DSCP.  Thereafter, on or about June 21, 2006, the General Manager of J Company created a PowerPoint that explained that by charging all military customers the same prices that defendant Supreme AG was charging the DSCP, this would "avoid questions during DSCP audits."  That PowerPoint was emailed to several Supreme Executives, including SE#1,

and Supreme Owner#1.  SE#1 chastised the J Company General Manager for making this statement, and within two days Supreme Owner#1 instructed SE#1 that the PowerPoint which had been distributed could not remain as it was.

48.     On or about July 6, 2006, during discussions about the need to reorganize J Company in order to continue to prevent disclosure to the DSCP of the J Company mark-up and the true relationship between defendant Supreme AG and J Company, SE#1 emailed Supreme Owner#1 stating that one of the needs for the J Company change is, "The 'security risk' we have with [the General Manager for J Company] and others having full visibility of agreements and margins." (Internal quotes in original).  SE#1 went on to list the plan for reorganization and stated that for DoD sales only the "sales prices will be fixed by [the Corporate Procurement Department] based on purchasing price plus mark up, prices to be fed into [J Company] BW system and used for invoicing, nobody in [J Company] knows mark up nor purchasing price."

**Perpetuating the Fraud Despite DSCP Inquiries and Prospective Whistleblower**

49.     In early March 2006, when the DSCP's contracting officer asked defendant Supreme AG about the prices Supreme was planning to charge for frozen bakery products, and demanded to see a manufacturer's invoice, defendant Supreme AG lowered its prices for those products to prices that did not include a J Company mark-up.  On or about March 14, 2006, instead of disclosing that the initial pricing had included a mark-up, SE#4 misled the DSCP's representative by explaining the change in pricing as follows:  "Based on more realistic quantities, we have been able to negotiate a better price."

50.     In June 2006, after the DSCP's contracting officer raised questions with defendant Supreme AG about how high its FF&V pricing was, instead of acknowledging that J Company

14

was adding a mark-up to the FF&V, Supreme Executives again misled the DSCP, claiming that the high prices were for a high quality of product, and offering to sell lower quality products for lower prices.  Defendant Supreme AG did this even after analyzing its J Company margin on the Delivered Price of the four items of FF&V which the contracting officer had given as examples of the excessively expensive items, and calculating that those margins were between 41% and 56%.

51.     On or about June 13, 2006, during discussions about whether J Company should agree to a visit by a DSCP official, the General Manager of J Company wrote to SE#1, SE#2, and SE#5, who at relevant times held the title "Director of Contract Administration – U.S. DoD Division," that "my team is trained to deny any formal relation with Supreme other than buyer/vendor.  I would prefer not to jeopardize this and attracting risks if not strictly needed." The General Manager of J Company then went on to say:  "We will prepare a nice ride to some vendors and probably can organize one mixed beverage container loading to 'show' the added value of [J Company] to the supply chain."  (Internal quotes in original).

52.     Even after a fired Supreme Executive threatened, in early 2007, to tell the DSCP about the ways in which it was being overcharged by defendant Supreme AG, Supreme AG and its owners neither informed the DSCP that Supreme AG had been charging the DSCP an inflated price as the Delivered Price of LMR, nor stopped the J Company mark-ups.  Instead, in the summer and early fall of 2007, Supreme Owner#1 and Supreme Owner#2 caused Supreme Company K to enter into negotiations of a "Separation Agreement" with that executive which was designed to induce that executive not to tell the U.S. government about the ways in which defendant Supreme AG was overcharging the DSCP under the SPV Contract.

53.    On or about April 16, 2007, executives of defendant Supreme AG and Supreme Company K received a copy of an email from an attorney who had been consulted by a fired Supreme Executive about the possible filing of a whistleblower lawsuit against defendant Supreme AG.  Immediately thereafter, on or about April 17, 2007, defendant Supreme AG began the process of hiring an outside consultant to give it advice on some contract compliance issues, including defendant Supreme AG's relationship with J Company.

54.    In or about August of 2007, defendant Supreme AG's outside consultant advised Supreme AG to disclose its relationship with J Company to the government.  In September 2007, Supreme AG and its owners deliberately designed the recommended disclosure to be unclear, so that it would not, in fact, alert the DSCP that Supreme owned and controlled J Company.

55.    On or about September 20, 2007, defendant Supreme AG sent a two-page letter to the DSCP, saying, on the second page of that letter, that an auditor whom Supreme AG had hired had "called to our attention the fact that Supreme should inform the government that a relationship exists between" Supreme and J Company.   Supreme AG omitted the critical facts that Supreme owned and controlled J Company.

56.    Between on or about September 21 and on or about September 26, 2007, Supreme and its owners caused Supreme Owner#2's spouse to sign, on Supreme Company K's behalf, a "Separation Agreement" with the fired Supreme Executive who had threatened to file the whistleblower lawsuit.  That agreement stated that the executive would receive, among other things, a payment of EUR 400,000 on September 30, 2010, provided that the executive did not cause:  a deterioration in the economic situation linked to the SPV Contract; the termination of the SPV Contract; or a decrease in the price levels for products, specifically including both LMR

16

and bottled water provided to the U.S. government.  In particular, the "Separation Agreement" provided that the fired Supreme Executive would receive the EUR 400,000 payment unless the executive engaged in any conduct causing any reduction in "the prices at which Supreme in its capacity as the Subsistence Prime Vendor (SPV) delivers the goods and provides the services …" including "significant changes as regards the sale of LMR…" and "the prices at which Supreme … supplies … water…".

57.     In or about October 2007, defendant Supreme AG's outside consultant recommended that Supreme AG disclose to the United States that J Company's pricing included a mark-up.  Supreme took no steps to make this disclosure until nearly a year later, in September 2008, when defendant Supreme AG placed, on an agenda for a meeting with the DSCP, "[J Company] charges – distribution fee adjustment" as one of a number of topics to be discussed at the meeting.

58.     On or about March 16, 2008, SE#8, who at relevant times held the title "Business Analyst," emailed SE#3, who at relevant times held the title "Director – Logistics Division," a spreadsheet setting forth the "[J Company] Sales & Gross Margin Analysis" for 2006 and 2007. Among other things, this spreadsheet showed, for each item, historical data on J Company's margins.  For both ice cubes and bakery in 2007, the margin was zero, with this annotation: "Single Price agreement/DSCP insisted on providing the manufacturer invoice to support price."

59.     On or about April 24, 2008, a DSCP representative emailed SE#5, noting that defendant Supreme AG's FF&V prices seemed "excessively high" compared to other Prime Vendors, and specifically noting that Supreme AG's Delivered Price for corn on the cob was 473% more than the price charged by another Prime Vendor in the same region.  Instead of

advising the DSCP representative that the price for the corn on the cob included a J Company profit margin that ranged from 22% to 45%, SE#3 wrote to the DSCP in an email on or about May 13, 2008: "[Supreme] remain[s] committed to ensuring fair and reasonable pricing on our entire product range and committed to ensuring transparency in the process." SE#3 then asked that the DSCP provide him with details about the other Prime Vendor's product and pricing. Defendant Supreme AG did nothing to reduce the Delivered Price for corn on the cob until April of 2009, after the U.S. government became aware of the true nature of the relationship between Supreme AG and J Company, became aware of the J Company mark-ups, and ordered that Supreme AG stop the mark-ups.

**DSCP Finally Discovers the J Company Mark-Up**

60.     In or about early March 2009, a former Supreme employee notified the DSCP that defendant Supreme AG owned and controlled J Company, and that J Company was adding a mark-up to the Delivered Price of goods.  The DSCP contacted Supreme AG and ordered the mark-ups stopped. The mark-ups ceased as of April 1, 2009.

61.     Even when confronted by DSCP personnel in a telephone call on March 10, 2009 about the "significant discrepancies" between the supplier's invoice prices for FF&V and what defendant Supreme AG was charging as the Delivered Price for that FF&V, SE#3 did not immediately acknowledge or admit that J Company was receiving a mark-up on these items, but instead said that defendant Supreme AG was "looking into this and pulling more information" about the pricing of FF&V.

62.     Because of defendant Supreme AG's and defendant Supreme FZE's fraud in marking up  FF&V and other LMR, the DSCP paid Supreme AG approximately $29.5 million

18

more than it should have as the Delivered Price for LMR between December of 2005 and April of 2009.

## OVERCHARGING FOR BOTTLED WATER

63.     It was a part of the scheme that defendants Supreme AG and Supreme FZE, and Supreme Owners #1 and #2, created an artificially high Delivered Price for bottled water, had J Company serve as a middleman to invoice the bottled water to Supreme AG, and had Supreme Company K charge an artificially high price to transport some of the water into Supreme's warehouse in Kabul, Afghanistan.

64.     In connection with this scheme, defendants Supreme AG and Supreme FZE, and Supreme Owners #1 and #2, intentionally prevented the DSCP from learning that Supreme AG had inflated the Delivered Price for bottled water which Supreme AG was charging.

65.     Defendant Supreme AG and its owners attempted to keep the United States government from using SDDC contractors to transport water for the SPV contract.  Defendant Supreme AG and its owners did this to prevent the United States government from discovering the true price of acquiring and transporting the bottled water.

66.     Even after SDDC contractors were given the task of transporting some of the water into Afghanistan, and even after defendant Supreme AG and its owners knew that Supreme AG did not incur transportation costs, Supreme AG continued to overcharge the government for bottled water.  Despite the expressed views of more than one Supreme Executive that the price being charged to the DSCP for bottled water could not be justified, defendant Supreme AG and its owners persisted in overcharging the DSCP on the Delivered Price of bottled water.

19

**Charging an Inflated Delivered Price for Water**

67.     From December 2005 through April of 2007, defendant Supreme AG charged the DSCP $6.45 as the Delivered Price of a 24-pack of .5 liter bottles of water.   At no time from December of 2005 through April of 2007 was the cost of acquiring and transporting that water as high as $6.45 per case.  Instead, the costs of acquiring and transporting water from different vendors into Supreme AG's OCONUS distribution point over this period were much lower, ranging from $1.64 to $5.03.

68.     At the outset of the SPV Contract, defendant Supreme AG set the Fixed Distribution Fee for a 24-pack of .5 liter bottles of water at $4.87, so that amount was added to the $6.45 Delivered Price, for a Unit Price of $11.32 per case.

**Using J Company and Supreme Company K to Obscure the Inflated Delivered Price for Water**

69.     In early March 2006, in an effort to obscure the true price and costs of acquiring and transporting the bottled water, defendant Supreme AG and its owners decided to have all water which was to be sold to the DSCP under the SPV Contract "purchased" from the water vendors by J Company, and then "resold" to Supreme AG for sale to the United States government.  This prompted SE#2 to send an email to other Supreme Executives, including Supreme Owner#1, which said, in part:  "Be careful with [J Company] - it will be hard to justify - I will let you answer all [DSCP contracting officer] queries on [J Company] - I will not participate."

70.     In March 2006, after defendant Supreme AG and its owners had decided to have J Company serve as the middleman for bottled water, the issue of the Delivered Price of bottled

water arose in discussions among Supreme Executives.  This prompted SE#1 to send an email to Supreme Owner#1 and SE#2 recommending that the price for bottled water not be lowered.  This email included SE#1's attempt to "justify" the inflated price.  The information attempting to justify the higher price included false components, and included components which were plainly illegitimate as components of Delivered Price, specifically including a "mark up."

71.     In May 2006, SE#10, who at relevant times held the title "International Transport Project Manager," emailed SE#1, saying he needed to invoice J Company for earlier containers of water sold to the United States, and asking how to do that.  SE#1 replied, copying J Company's General Manager, among others, saying, among other things, "Rate for transportation should be per case, please charge at $4.50 per case."  After some questions by SE#10 about why that should be the rate, SE#1 responded:  "Please charge $4.50, this translates into $9000 per container leaving some profit in [Supreme Company K]."

72.     In October 2006, in a further effort to create the appearance that J Company was a legitimate middleman, defendant Supreme AG and its owners decided to require that all Supreme components, divisions, and customers (not just the component and personnel handling the SPV Contract) purchase water for Afghanistan from J Company.  Some Supreme component heads, including SE#7, who at relevant times held the title "Director – Military Supply Division," resisted this because this would raise the cost of bottled water for Supreme's other customers. Supreme and its owners persisted despite this.

**Keeping the Inflated Delivered Price of Water Despite Changes in Source and Transportation**

73.     On or about September 29, 2006, in connection with a proposal to have J Company serve as the middleman for bottled water acquired from a supplier located in Afghanistan, SE#2 emailed Supreme Owner#1, SE#1, and SE#3 saying, "Be careful about marking up [the Afghanistan supplier] water – this will lead to problems.  Since we are procuring locally – it will be very hard to demonstrate any value-added from [J Company]."  Despite this, defendant Supreme AG and its owners continued to charge an artificially high Delivered Price for water.

74.     In that same September 29, 2006 email to Supreme Owner#1, SE#1, and SE#3, SE#2 recommended against including two other executives (including J Company's General Manager) on emails about the pricing of the water, given "the current issues with" another Prime Vendor whom defendant Supreme AG had recently learned was under federal criminal investigation.   Supreme Owner#1 responded to this part of the email by saying:  "I agree . . . you should not include anyone who does not have to know in pricing emails."

75.     Among the suppliers of bottled water for the SPV contract were suppliers located in the Persian Gulf.  Water from this region was the least expensive water used.  By the fall of 2006, the DSCP had insisted that all water from the Persian Gulf be transported by SDDC contractors.

76.     On or about October 9, 2006, SE#2 emailed Supreme Owner#1, SE#1, and SE#4, stating:  "With the addition of [the Afghanistan supplier] and now with SDDC moving all

containers from the Gulf – we need to look at lowering the price."  Nonetheless, defendant Supreme AG and its owners persisted in charging an artificially high Delivered Price for water.

77.     On or about November 13, 2006, SE#9, who at relevant times held the title "Financial Controller," emailed SE#1 and other Supreme Executives stating, "It has come to my attention that the transport costs of the water sold to DoD is now being paid by the U.S. Govt. The price that [J Company] was and still is charging DoD is inclusive of the Transport cost." SE#9 went on to say, ". . . if there is a change to the sale price a Credit note can be calculated and produced from [J Company] to DoD . . . ".  No such credit was ever received by the U.S. government, and defendant Supreme AG and its owners persisted in charging an artificially high Delivered Price for water.

78.     On or about April 11, 2007, in a discussion about SE#2 not being part of water planning communications, SE#2 wrote to Supreme Owner#1: ". . . I will let you all deal with it and do not involve me on water issues whatsoever."  SE#2 also said, "I do not like being used as a straight man on communications with DSCP on issues which I am not included on," and "We will wake up sleeping dogs if we are not careful with the Gulf water.  Regardless of what was previously determined to be fair and reasonable – the [mix of water suppliers] has changed as well as the transportation mode (SDDC).  We need to agree internally on how to change our water price now – to reflect the current situation."

**Efforts to Prevent DSCP From Learning of Inflated Delivered Price for Water**

79.     Even after a fired Supreme Executive threatened to tell the DSCP about the ways in which it was being overcharged by defendant Supreme AG, Supreme AG and its owners did not inform the DSCP that Supreme AG had been charging the DSCP an inflated price as the

Delivered Price of bottled water.  Defendant Supreme AG and its owners instead caused Supreme Company K to enter into an agreement with this fired executive which provided that the fired executive would receive a very substantial payment provided that he did not cause Supreme AG to make less money on its SPV contract, including by taking any actions which caused a reduction in the prices for bottled water.

80.     In mid-April 2007, a few days after Supreme received a copy of an email from an attorney to the fired executive discussing the filing of a whistleblower lawsuit against defendant Supreme AG, a Supreme Executive contacted the DSCP and falsely suggested that although Supreme AG had not been charging a weighted average of the supplier prices, it had been charging the DSCP a price that reflected the true costs of acquiring and transporting water from the supplier who had charged Supreme AG the highest price.

81.     Beginning in or about May 2007, defendant Supreme AG lowered the Delivered Price for a 24-pack of .5 liter bottled water below $6.45.  The new price was based on the actual prices of water from local sources within Afghanistan, but ultimately the local sources were supplemented with water from cheaper sources, driving the true costs lower.  Because the Delivered Price was not also lowered to reflect the true costs, the DSCP continued to overpay defendant Supreme AG for bottled water in and after April 2007.

82.     In 2007, once defendant Supreme AG had hired an outside consultant to review its compliance with certain aspects of the contract, Supreme AG did not direct its consultant to review the price that Supreme AG charged the DSCP for bottled water.  In fact, Supreme Owner#1 specifically instructed a Supreme Executive not to raise with the consultant the issue of the price of bottled water.

24

83.     Because of defendant Supreme AG's and defendant Supreme FZE's fraudulent overcharging on the Delivered Price of bottled water, the DSCP paid Supreme AG approximately $18.5 million more than it should have as the Delivered Price for .5 liter bottles of water for the period from December 2005 through April 2007.

84.     Between December 2005 and April 2009, due to the fraud by defendants Supreme AG and Supreme FZE in marking up the FF&V and other LMR, and overcharging for bottled water, the DSCP paid Supreme AG approximately $48 million more than it should have as the Delivered Price for the LMR and bottled water.

All in violation of Title 18, United States Code, Section 1031.

## COUNT TWO

(Conspiracy to Commit Major Fraud Against the United States)

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 84 of Count One are realleged here.

2.      From at least in or about July 2005, through and including in or about April 2009, in the Eastern District of Pennsylvania, and elsewhere, defendant

### SUPREME FOODSERVICE AG

conspired and agreed, together and with others known and unknown to the United States Attorney, to commit an offense against the United States, that is, to knowingly devise and intend to devise a scheme to defraud the United States and to obtain money and property of the United States, by materially false and fraudulent pretenses, representations, and promises, in connection with the SPV contract, in violation of Title 18, United States Code, Section 1031.

### MANNER AND MEANS

It was part of the conspiracy that:

3.      Defendant Supreme AG engaged in the manner and means described in paragraphs 23-84 in Count One of this information.

### OVERT ACTS

In furtherance of the conspiracy and to accomplish its objects, defendant Supreme AG, through its owners, officers, executives, and employees, committed the following overt acts, among others, in the Eastern District of Pennsylvania and elsewhere:

4.      On or about August 22, 2005, SE#4, acting on defendant Supreme AG's behalf, sent an email to others, including Supreme Owner#1, saying that the prices which he proposed

26

that Supreme AG charge the DSCP for certain items already included margins of "approximately 57-60%" over the true price from the supplier.

5.    On or about August 22, 2005, SE#1, acting on defendant Supreme AG's behalf, sent an email saying that Supreme AG should not raise its prices higher because "we would like to stay credible with the customer," and would not want to invite a "challenge" from the DSCP.

6.    On or about September 16, 2005, Supreme Owner#1 reviewed and made changes to the markups for some specific items of LMR.  Among other things, Supreme Owner#1 increased the markup for non-alcoholic beer from 25% to 125%.  This inflated Delivered Price for non-alcoholic beer was then charged to the DSCP under the SPV Contract.

7.    On or about November 2, 2005, Supreme Owner#1 emailed SE#1 and SE#6 seeking their "assurances that the [J Company] setup has been completed," and asking whether Supreme Company K would bill transport costs to J Company or to Supreme AG.  SE#1 replied that based on his discussions with SE#6, Supreme Company K should bill J Company, so that the invoice Supreme AG had would be from J Company, which would appear to be a company unrelated to Supreme AG.

8.    On or about December 19, 2005, when a Supreme employee created a Supreme organizational chart that included J Company, SE#1, acting on defendant Supreme AG's behalf, wrote, "No [J Company] person can be shown in a Supreme chart for various reason [sic].  [J Company] is a supplier to Supreme."

9.    On or about January 28, 2006, when discussing with other executives whether J Company should organize the airfreight for all Supreme activities in Afghanistan, Supreme Owner#1 told SE#1 that "the problem" with J Company having that role was that many Supreme

27

employees were asking what J Company was, and what Supreme's relationship to J Company was, and therefore, per Supreme Owner#1, "please refrain."

10.     In early March 2006, in an effort to obscure the true price and costs of acquiring and transporting the bottled water, defendant Supreme AG and its owners arranged to have all water which was to be sold to the DSCP under the PV program "purchased" from the water vendors by J Company, and then resold to Supreme for sale to the U.S. government.

11.     In early March 2006, after defendant Supreme AG and its owners had arranged to have J Company serve as the middleman for bottled water, the issue of the Delivered Price of bottled water came up in discussions among Supreme Executives.  This prompted SE#1, acting on defendant Supreme AG's behalf, to send an email, on or about March 8, 2006, to Supreme Owner#1 and SE#2 which recommended that the price for bottled water not be lowered, and which included SE#1's attempt to "justify" the inflated price.

12.     In early March 2006, when the DSCP's contracting officer inquired of defendant Supreme AG regarding the price of frozen bakery products, and then demanded to see a manufacturer's invoice, defendant Supreme AG lowered its price for those products to a price that did not include a J Company mark-up.  On or about March 14, 2006, SE#4, acting on Supreme AG's behalf, explained this change in pricing to the DSCP by saying: "Based on more realistic quantities, we have been able to negotiate a better price."

13.     On or about March 18, 2006, in discussing whether they could mark up the price for ice cubes to be sold to the DSCP, SE#1 wrote to Supreme Owner#1, SE#4, and SE#2: "I don't think we can mark up through [J Company] since DSCP knows the price from [the

supplier]." Supreme Owner#1 forwarded the email to Supreme Owner#2, pointing out that there were "dozens" of emails like that one.

14. On or about May 29, 2006, SE#1 directed SE#10 to have Supreme Company K charge a specific amount for the transportation of bottled water under the SPV contract to support the inflated Delivered Price for bottled water and to leave some profit in Supreme Company K.

15. On or about June 13, 2006, during discussions about whether J Company should agree to a visit by a DSCP official, the General Manager of J Company wrote to SE#1, SE#2, and SE#5 that "my team is trained to deny any formal relation with Supreme other than buyer/vendor. I would prefer not to jeopardize this and attracting risks if not strictly needed." The General Manager of J Company then went on to say: "We will prepare a nice ride to some vendors and probably can organize one mixed beverage container loading to 'show' the added value of [J Company] to the supply chain." (Internal quotes in original).

16. On or about July 6, 2006, during discussions about the need to reorganize J Company, SE#1 emailed Supreme Owner#1 stating that one of the needs for the changes was "The 'security risk' we have with [the General Manager for J Company] and others having full visibility of agreements and margins." (Internal quotes in original).

17. On or about September 26, 2007, defendant Supreme AG and its owners caused Supreme Company K to enter into a "Separation Agreement" with a fired Supreme Executive which was designed to induce that executive not to tell the DSCP about the ways in which Supreme AG was overcharging the DSCP under the SPV contract.

18. On or about April 19, 2007, a Supreme Executive acting on defendant Supreme AG's behalf contacted the DSCP and falsely suggested that Supreme AG had been charging the

DSCP a price for bottled water that reflected the true costs of acquiring and transporting water from the supplier who had charged Supreme AG the highest price.

19.     On or about May 13, 2008, in response to a DSCP inquiry about the high prices of a certain commodity, SE#3, acting on defendant Supreme AG's behalf, did not disclose that the Delivered Price of that commodity was inflated by the J Company mark-up, but asked the DSCP's personnel to provide him with details about another PV's pricing.

All in violation of Title 18, United States Code, Section 371.

## COUNT THREE

(Wire Fraud)

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1.    Paragraphs 1 through 84 of Count One are realleged here.

## THE SCHEME TO DEFRAUD

2.    From at least in or about July 2005, through in or about April 2009, in the Eastern

District of Pennsylvania, and elsewhere, defendant

## SUPREME FOODSERVICE AG

knowingly devised and intended to devise a scheme to defraud the Defense Supply Center

Philadelphia, and to obtain money and property of the Defense Supply Center Philadelphia by

materially false and fraudulent pretenses, representations, and promises.

3.    It was the object of the scheme that defendant Supreme AG submit claims for

payment that would cause the DSCP to pay an inflated Delivered Price for LMR and bottled

water, and thus increase Supreme AG's profits above that permitted under the SPV contract.

## MANNER AND MEANS

4.    It was a part of the scheme to defraud that defendant Supreme AG engaged in the

manner and means described in paragraphs 23-84 in Count One of this indictment.

5.    Each time J Company provided defendant Supreme AG with an invoice which

included a mark-up for LMR, and each time Supreme AG submitted an invoice or claim for

payment for LMR goods under the SPV contract between in or about December 2005 and in or

about April 2009, defendant Supreme AG knowingly caused a wire transmission in interstate and

foreign commerce in furtherance of the scheme and plan to defraud the United States.

31

6.      Each time defendant Supreme AG submitted an invoice or claim for payment for bottled water under the SPV contract from in or about December 2005 through in or about April 2007, Supreme AG knowingly caused a wire transmission in interstate and foreign commerce in furtherance of their scheme and plan to defraud the United States.

7.      Numerous wires in and affecting interstate and foreign commerce were used in furtherance of this scheme.

8.      On or about February 14, 2007, in the Eastern District of Pennsylvania, and elsewhere, defendant

**SUPREME FOODSERVICE AG**

for the purpose of executing the scheme described above, and attempting to do so, and aiding and abetting its execution, caused to be transmitted by means of wire communication in interstate and foreign commerce certain data, that is, an electronic data interchange transmission of an invoice from Supreme in Dubai, United Arab Emirates, through Ogden, Utah, to the United States government in Philadelphia, Pennsylvania.

All in violation of Title 18, United States Code, Sections 1343 and 2.

## NOTICE OF FORFEITURE

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT**:

As a result of the violations of Title 18, United States Code, Sections 1343 set forth in this information, defendant

### SUPREME FOODSERVICE AG

shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such offenses, including, but not limited to the sum of at least $10,000,000.

If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

(a)   cannot be located upon the exercise of due diligence;

(b)   has been transferred or sold to, or deposited with, a third party;

(c)   has been placed beyond the jurisdiction of the Court;

(d)   has been substantially diminished in value; or

(e)   has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Sections 981(a)(1)(C).

ZANE DAVID MEMEGER
United States Attorney

34